IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT CHAPOLINI, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 24-CV-1136 |
| | : | |
| BLANCHE CARNEY, *et al.*, | : | |
|     Defendants. | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                                           **JULY 30, 2025**

Vincent Chapolini alleges constitutional claims pursuant to 42 U.S.C. § 1983, relating to his exposure to "Paper-Deuce K2" ("K2") secondhand smoke while he was housed at the Riverside Correctional Facility ("RCF") in Philadelphia. He names as Defendants the former Philadelphia Prisons Commissioner, the RFC Warden, and three RFC correctional officers. Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 41) and Chapolini's Response in Opposition (ECF No. 43). For the reasons that follow, Defendants' Motion to Dismiss will be denied.

**I.      FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY[1]**

Chapolini alleges that while detained by the Philadelphia Department of Prisons ("PDP") from January 12, 2020 to April 25, 2024, both as a pretrial detainee and as a sentenced prisoner, he was exposed to secondhand smoke caused by inmates smoking K2. (Am. Compl. at 4-5.) K2 is allegedly made by combining fentanyl, horse tranquilizer, roach spray, and nail polish remover and then spraying this mixture on paper, which is dried, combined with tea leaves, and smoked.

---

[1] The factual allegations are taken from the Amended Complaint (ECF No. 40). The Court adopts the sequential pagination supplied by the CM/ECF docketing system.

(*Id*. at 4.)  Chapolini alleges that smoking K2 produces a "dense fog of toxic secondhand smoke." (*Id*.)  Although Chapolini complains about being exposed to K2 while housed at three different PDP facilities, he limits his Amended Complaint to his specific exposure while housed at RCF. (*Id*. at 4-5.)  In his Amended Complaint, he names as Defendants former Philadelphia Police Commissioner Blanche Carney, Warden Pierre Lacombe, and three RCF correctional officers, K. Lytle, Sipp, and Delgado.  (*Id*. at 2-3.)

After entering into a negotiated plea agreement, Chapolini began serving a 23-month sentence at RCF on October 24, 2023.  (*Id*. at 5.)  At RCF, Chapolini was housed in a cell in the E-Unit with Zaire Anderson, a K2 "chain smoker."  (*Id*.)  Chapolini states that on two occasions, Carney ordered that his unit be locked in their cells as punishment for inmates smoking K2.  (*Id*.) One "lock-in" was ordered from October 25, 2023 through November 1, 2023, and the other one was ordered from November 1, 2023 through November 6, 2023 "and/or" November 8, 2023.  (*Id*.) Carney allegedly "gave a directive" for the lock-in "via a memo" given to Lacombe, who then ordered three assigned unit sergeants, who then ordered three unit correctional officers, Defendants Delgado, Sipp, and Lytle.  (*Id*.)  The lock-ins only served to worsen the "toxic air" exposure and "unsafe condition" because the prison's ventilation system "only recycled the toxic secondhand smoke," and because there were no windows to open nor any other "reasonable measures taken to purify the air."  (*Id*.)  In addition, despite the alleged "punishment," Chapolini's cellmate and other chain smokers continued to use K2 during the lock-ins.  (*Id*.)

At some point, an "appointed independent city monitor" heard about the "mass lockdown directive issued by . . . Carney" in response to inmates' use of K2, and "stopped it."  (*Id*.)  However, while the lock-ins may have stopped, the smoking of K2 and the presence of its secondhand smoke continued throughout the entire E-Unit.  (*Id*. at 6-7.)  Chapolini alleged that half of the inmates on

the E-Unit smoked K2, which caused "nonstop" exposure to the smoke, even during recreation time. (*Id*. at 7.)  As a result of Chapolini's exposure to the K2 secondhand smoke, he suffered respiratory problems, dizziness, visual disturbances, mental confusion, nausea, muscle rigidity, headaches, extreme irritability, and "worsened depression and anxiety." (*Id*. at 7-8.)  Plaintiff filed grievances complaining about the lock-ins, the K2 smoke, and the effect of the secondhand smoke on him as an "asthmatic/covid long hauler." (*Id*. at 8, 17-20.)  His grievances were allegedly ignored. (*Id*. at 9.)

Based on these allegations, Chapolini asserts Eighth Amendment claims against the Defendants, both in their individual and official capacities.  For relief, he seeks money damages. (*Id*. at 13.)  Defendants collectively filed a Motion to Dismiss Chapolini's Amended Complaint.[2] (ECF No. 41.)  Chapolini opposes the Motion.[3] (ECF No. 43.)

---

[2] In his initial Complaint, Chapolini named only Carney and the City of Philadelphia. (*See* ECF No. 2.)  After Chapolini filed his Complaint, the Court granted him leave to proceed *in forma pauperis* and ordered that his Complaint be served on the Defendants. (*See* ECF No. 5.)  Once served, both Carney and the City of Philadelphia moved to dismiss the Complaint. (ECF Nos. 17 (City of Philadelphia), 27 (Carney).)  Chapolini responded to the Motions. (ECF Nos. 30, 33.)  He also filed a "Request to Amend Paragraph 15 of the Complaint," wherein he sought to include additional allegations and add defendants to the action. (ECF No. 34.)  The Court construed Chapolini's Request to Amend Paragraph 15 as a Motion to Amend the Complaint under Federal Rule of Civil Procedure 15, and permitted him additional time to file an amended Complaint. (ECF No. 37.)  Chapolini initially responded with a Motion to Withdraw Request to Amend Paragraph 15 of the Complaint (ECF No. 39), but then subsequently filed an Amended Complaint (ECF No. 40), which rendered his request to withdraw as moot.  Chapolini did not specifically rename the City of Philadelphia as a Defendant in his Amended Complaint.  However, as set forth below, the Court will construe Chapolini's claims asserted against the individual Defendants in their official capacities as *Monell* claims against the City of Philadelphia.  *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978).

[3] Chapolini styled his Response as a Motion in Opposition to Defendants' Motion to Dismiss.

II.     **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff,

and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

## III. DISCUSSION

Chapolini asserts Eighth Amendment claims under § 1983, the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, and, therefore, a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998). In support of dismissal, Defendants argue that (1) all official capacity claims should be dismissed because Chapolini fails to plead a basis for municipal liability, (2) all claims against Carney and Lacombe should be dismissed because vicarious liability does not apply to § 1983 actions, and (3) all of Chapolini's claims should be dismissed because he has not sufficiently alleged deliberate indifference. As set forth below, none of Defendants' arguments have merit.

### A. Official Capacity and Municipal Liability Claims

Defendants seek dismissal of all official capacity claims against the individual Defendants. For reasons that are not clear, Chapolini did not separately name the City of Philadelphia in his Amended Complaint despite naming the City in his Complaint. Either way, claims against municipal officials named in their official capacity are indistinguishable from claims against the

municipality that employs them, here the City of Philadelphia. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell*, 436 U.S. at 690 n.55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. Accordingly, the Court construes all official capacity claims asserted against the individually named Defendants as a municipal liability or *Monell* claim asserted against the City of Philadelphia.

To plead a basis for municipal liability against a city under § 1983, a plaintiff must allege that the city's policy or custom caused the violation of his constitutional rights. *See Monell*, 436 U.S. at 694. "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id*. (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). It is not enough, however, to allege the existence of a policy or a custom. "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries." *Id*. (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)). This can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged. *Id*. (quoting *Bielevicz*, 915 F.2d at 850).

Defendants argue that Chapolini's *Monell* claims should be dismissed because Chapolini fails to allege facts to state plausibly that any City of Philadelphia policy caused his alleged constitutional harm. They contend that Carney's directive to lock in Chapolini's unit on two occasions as punishment for the secondhand smoke is instead "evidence of a lack of deliberate indifference" because it "demonstrates that the prison authorities are actively working to enforce the prison's prohibitions against illegal drugs and smoking." (ECF No. 41 at 6-7.) Chapolini alleges that without curbing the actual smoking of K2, Defendants instead locked him in his cell for six to seven days at a time, which only served to worsen the "unsafe condition" caused by the "toxic" secondhand smoke. (*Id*. at 5.) Chapolini also alleges that he suffered physical and psychological injuries from the exposure. (*Id*.) Regardless of whether the lock-in directive was an attempt to enforce the prison's drug policies, Chapolini sufficiently alleges that the directive proximately caused his injuries. Defendants also argue that the City's "no smoking" policy at its prisons did not cause Plaintiff's injuries from K2 secondhand smoke. (ECF No. 41 at 6.) However, Chapolini does not allege that the "no smoking" policy at RCF caused his injuries. Rather, he alleges that the lock-in directive and the longstanding custom of permitting inmates to smoke K2 at RCF despite that no-smoking policy caused his injuries. Accordingly, Defendants' Motion to Dismiss Chapolini's *Monell* claims on this basis will be denied.

B.      **Individual Capacity Claims against Carney and Lacomb**

Defendants also move to dismiss all individual capacity claims against former Philadelphia Police Commissioner Carney and Warden Lacomb, contending simply that these Defendants cannot be found vicariously liable for the actions of their prison employees. Defendants are correct that there is no vicarious liability for § 1983 actions and that, rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated

7

the Constitution." *Iqbal*, 556 U.S. at 676.  Supervisors like Carney and Lacomb can only be found liable for the unconstitutional acts undertaken by their subordinates in two scenarios.  First, a supervisor may be liable if he or she, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom, which directly caused [the] constitutional harm." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id*.

Defendants' argument overlooks Chapolini's allegations about the personal involvement of Carney and Lacomb in the events giving rise to his claims.  Chapolini asserts that Carney authored a memo that conveyed the lock-in directive through the chain of command. (Am. Compl. at 5.)  Carney ordered Lacomb, who in turn ordered three RFC sergeants not named in this action (Bean, Blair, and Johnson), who in turn ordered Defendants RFC correctional officers Delgado, Sipp, and Lytle to lock Chapolini and other inmates on the E-Unit in their cells, where the smoky conditions were worse. (*Id*. at 5-6.)  Thus, Chapolini plausibly alleges that Carney maintained a policy that proximately caused his constitutional injuries and that both Carney and Lacomb personally directed others to violate his constitutional rights by directing the lock-ins.  Accordingly, Defendants' Motion to dismiss the individual capacity claims against Carney and Lacomb on this basis will be denied.

    **C.**    **Dismissal based on Lack of Deliberate Indifference**

Finally, Defendants argue that all of Chapolini's claims—individual and *Monell*—should

be dismissed because Chapolini failed to establish that Defendants were deliberately indifferent to an excessive risk to his health or safety. Chapolini's claims center on his exposure to secondhand K2 smoke and the lock-in measures that were ordered by Carney as a disciplinary measure to respond to inmates' use of K2. To state a constitutional violation based on exposure to smoke, a prisoner must allege that prison officials, "with deliberate indifference, exposed him to levels of [smoke] that pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *see also Moore v. Durand*, No. 22-2915, 2023 WL 4884855, at *1 (3d Cir. Aug. 1, 2023) ("To allege that exposure to [environmental tobacco smoke] unreasonably endangers his future health, an inmate must show (1) exposure to 'unreasonably high' levels of [smoke] contrary to contemporary standards of decency; and (2) deliberate indifference by the authorities to the exposure." (quoting *Helling*, 509 U.S. at 35-36)). Deliberate indifference is a subjective standard. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). A plaintiff must allege that the prison officials "knew or were aware of and disregarded an excessive risk to [his] health or safety." *Id*. at 135.

The Court understands Defendants to argue that because they responded to the problem of inmates smoking K2 at RFC by implementing the lock-ins, they cannot be deliberately indifferent to any risk Chapolini faced from exposure to secondhand K2 smoke. Defendants cite *Farmer v. Brennan*, 511 U.S. 825, 844 (1994), to support their contention. In *Farmer*, the Court held that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*.; *see also Hamilton v. Leavy*, 117 F.3d 742, 748 (3d Cir. 1997) ("If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind."). However, the question remains whether locking Chapolini

9

in his cell as a punishment, where the hazard caused by the secondhand K2 smoke only worsened, was a *reasonable* response to the risk posed to his health by the exposure.[4] Liberally construing the allegations in the Amended Complaint, Chapolini has alleged sufficient facts to support a plausible inference that Defendants knew about and disregarded an excessive risk to his health caused by the presence of secondhand K2 smoke when they ordered and implemented the lock-in. Accordingly, Defendants' Motion to Dismiss Chapolini's claims on this basis will also be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss. In addition, Chapolini's case will be referred to the Prisoner Panel for *Pro Se* Plaintiffs for possible appointment of counsel. An appropriate Order follows.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**

---

[4] Defendant's reliance on *Outen v. Prialeau*, No. 12-4166, 2013 WL 1875042, at *4 (E.D. Pa. May 3, 2013), to support this contention is misplaced. In *Outen*, the court concluded that prison officials "acted reasonably" by implementing lockdown measures in an attempt to "maintain a drug free facility" and that this negated a finding of deliberate indifference. *Id*. at *4. However, the risk at issue in *Outen* was the plaintiff's exposure to K2 in light of his recovery from drug abuse and not exposure to secondhand smoke.